HENRY D. GEE CO. v. UNITED STATES

No. 7772.—
Entry No. 1246.

First Division, Appellate Term

(Decided January 17, 1950)

Before OLIVER, COLE, and MOLLISON, Judges

MOLLISON, Judge: The merchandise covered by this application for review of the decision of the single judge sitting in reappraisement consists of mixed feed oats (screenings) imported into the United States from Canada. The invoice price is $38.45 (U. S. currency) per ton of 2,000 pounds, c. & f. Seattle, and including a so-called "equalization fee" of 12 cents (Canadian) per bushel of 34 pounds. The merchandise was entered at the invoice price less the nondutiable charges of freight, consular invoice, and brokerage, and less the equalization fee. The amount of the fee, however, was added back under certificate of pending reappraisement as provided for in section 503 (b) of the Tariff Act of 1930.

The mixed feed oats in question were appraised as entered, and upon appeal for reappraisement the trial court found that export value, as defined in section 402 (d) of the Tariff Act of 1930, was the proper basis for the determination of the value of the merchandise, and that such value was the appraised value.

Both parties are in agreement that the correct basis of value for the mixed feed oats involved is export value as found by the trial court, it appearing that there were no sales in the foreign market of merchandise such as that here involved at or about the time of the exportation of the merchandise in question. The only matter in dispute is the inclusion of the equalization fee in such export value, the appellant here, plaintiff below, contending that the entered and appraised value, less the equalization fee, represents the statutory export value.

The statute involved, section 402 (d) of the Tariff Act of 1930 (19 U. S. C. 1940 ed. § 1402 (d)), reads as follows:

SEC. 402. VALUE.

*     *     *     *     *     *     *

(d) EXPORT VALUE.—The export value of imported merchandise shall be the market value or the price, at the time of exportation of such merchandise to the United States, at which such or similar merchandise is freely offered for sale to all purchasers in the principal markets of the country from which exported, in the usual wholesale quantities and in the ordinary course of trade, for exportation to the United States, plus, when not included in such price, the cost of all containers and coverings of whatever nature, and all other costs, charges, and expenses incident to placing the merchandise in condition, packed ready for shipment to the United States.

The appellant's case is based upon the contention that the equalization fee is actually an export tax, i. e., a tax on the act of exportation. At this date the law is well settled that true export taxes, that is, taxes which accrue only upon the exportation of merchandise from a foreign country, are not part of the export value of merchandise under the provisions of section 402 (d), *supra. Sternfeld v. United States*, 12 Ct. Cust. Appls. 172, T. D. 40065; *United States v. Tadross & Co.*, 14 id. 10, T. D. 41528. This ruling is based upon the reasoning that the export value section of the tariff act seeks to ascertain the market value (as that term is defined in the section) of goods in the foreign market at the time when such goods are "packed ready for shipment to the United States," i. e., prior to shipment, and hence when such export taxes accrue *upon* exportation they form no part of the market value of the merchandise in the foreign market at the time contemplated by the valuation statute.

The Government, on the other hand, contends that the equalization fee is not a tax at all, much less an export tax, but is an integral part of the market value.

Summarized, the record discloses the following facts concerning the equalization fee in question: The fee was an amount per bushel collected by the Canadian Wheat Board, an agency of the Canadian Government, from those who wished to export grain. Such persons paid an amount per bushel of grain for a so-called "permit," which amount was fixed by the Canadian Wheat Board from day to day.

Notice to those interested (at least, so far as the record discloses, in Vancouver, British Columbia) of the amount determined by the Board as the fee for any given day was obtained by posting the same at 11 a. m. each day on the bulletin board at the Merchants' Exchange in Vancouver.

The record shows that at the time of the exportation of the merchandise here involved there was a ceiling price of $31.35 per ton on oats of the type at bar when sold for home consumption in Canada, and presumably (although the record does not so state), farmers would have to sell at this price or lower in order to sell their oats at all.

. The record also shows that at the time of exportation of the involved merchandise dealers in grain in Canada were permitted to sell screenings of the type here in issue for export at $35.43 per ton, the difference between the Canadian ceiling price of $31.35 and the export price of $35.43 obviously covering overhead and a profit to the dealer. In addition, the record shows that while a permit obtained by paying the equalization fee was required in order to export grain, such permits might be purchased in advance, even when the person who purchased them might not have had any grain on hand or on order. To illustrate, a permit to export 1,000 bushels of wheat might be purchased by a dealer on a day when the fee was 8 cents per bushel, whether or not the dealer on that day had any grain to export. The same permit would be valid in connection with the exportation of grain on a day when the equalization fee was fixed at 12 cents, the difference between the cost of the permit to the dealer at 8 cents per bushel and its value on the date of exportation at 12 cents per bushel being profit in the hands of the dealer. Of course, the reverse might be true, that is, that the fee in force at the time of exportation might be less than the amount at which the permit was purchased, in which case the dealer would take a loss on the equalization fee portion of the transaction.

The practice, so far as the record discloses, in the obtaining of permits was for the dealer to offer the grain at a price which included the equalization fee in force at the time of sale, from which it appears that it was the duty of the offerer to purchase the permit by the payment of the equalization fee. The mechanics of connecting a permit with the merchandise ultimately exported are not revealed by the record.

It does not appear that the offeree could purchase grain in Canada for export at a price not including the equalization fee and obtain the permit himself. Furthermore, the record is silent as to what happened if the sale was consummated at the offered price including the equalization fee in force on the date of *sale*, and it transpired that a different equalization fee was in force on the date of *exportation*. Possibly the seller took the loss or gain, as the case may be. The record likewise does not show who would recover the amount of the

equalization fee if the goods were destroyed after sale and appropriation to the contract but prior to exportation, or, in fact, if in such case the fee was recoverable at all.

The Government urges, and the court below held, that since the price at which the merchandise was freely offered for sale to all purchasers in the principal markets of Canada for exportation to the United States included the equalization fee, the fee was properly part of the market value, and includable in the export value. We note that the offered price also included freight to Seattle, which all agree is not properly part of the export value of the grain in question, and it would appear that the mere fact, standing alone, that an item was included in the offered price, would be no conclusive determinant of its character as part of statutory export value.

It is pointed out by the Government that the record shows that the sums realized by the collection of the equalization fee were ultimately returned to the farmers in proportion to the number of bushels of wheat they delivered, and it is urged that the fee is not a tax at all but a part of the cost of the goods which went to the producer instead of the seller.

In our view, whether the fee be denominated a tax or a cost makes no difference (see *General Dyestuff Corp.* v. *United States*, 19 C. C. P. A. 309, T. D. 45480)—the whole point at issue is, when did the tax or cost accrue? Did it accrue only upon exportation of the goods, or did it accrue at the time contemplated by the valuation statute for determining the value of the goods? So far as its mechanics are revealed by the record, it might be referable to either a tax on or added cost of the transaction or a tax on or added cost of the exportation.

As we see it, the precise nature, characteristics, and incidence of the fee are not well enough delineated by the record to enable the court to come to any sound conclusion as to the exact status of the fee from a valuation standpoint. No attempt was made to prove the Canadian law concerning the fee or its administration except by the testimony of a layman, who did not demonstrate or pretend any detailed knowledge of either the law or its administration.

We therefore conclude that the appellant here, plaintiff below, failed to make out a *prima facie* case sufficient to overcome the statutory presumption of correctness attaching to the value found by the appraiser. Under such circumstances, we have no other course than to make the following findings of fact:

(1) That the merchandise herein consists of mixed feed oats (screenings) exported from Canada on February 12, 1946.

(2) That at the time of exportation of the merchandise involved there were no sales or offers for sale in the foreign market of merchandise such as that here involved.

(3)   That the market value or price at the time of exportation of such merchandise to the United States, at which such merchandise was freely offered for sale to all purchasers in the principal markets of Canada, in the usual wholesale quantities and in the ordinary course of trade, for exportation to the United States, including the cost of all containers and coverings of whatever nature, and all other costs, charges, and expenses incident to placing the merchandise in condition, packed ready for shipment to the United States, was the value returned by the appraiser.

We conclude as matters of law:

(1)   That export value, as defined in section 402 (d) of the Tariff Act of 1930, is the proper basis of value of the merchandise in question, and

(2)   That such value is the appraised value.

Judgment will therefore issue affirming the judgment of the single judge.